LAWRENCE THIEDE V. STATE OF NEBRASKA.

FILED APRIL 11, 1921. No. 21819.

1. **Homicide:** INVOLUNTARY MANSLAUGHTER: INTENT. The furnishing of intoxicating liquor to another, though prohibited by law, is not ordinarily such an unlawful act, within section 8583, Rev. St. 1913, as carries with it that intentional wrong toward another which will supply the place of the criminal intent, necessary to prove criminal homicide and support the charge of involuntary manslaughter.

2. ———: ———. But, where a person furnishes to another intoxicating liquor which, by reason of its extreme potency or poisonous ingredients, is dangerous to use as a beverage, and the party

Thiede v. State.

furnishing the liquor knows, or should have known, of the danger, the unlawful act of furnishing the liquor is so characterized by reckless conduct as to be sufficient to support a charge of involuntary manslaughter, where death results from the drinking.

3. ———: ———: DEFENSE. Where the defendant gave intoxicating liquor to another to drink, the fact that the other voluntarily drank it is only a concurring cause with that of the defendant, and, though such other party may have been guilty of contributory negligence, such negligence is not a defense in a criminal homicide.

4. ———: ———: SUFFICIENCY OF EVIDENCE. Evidence examined, and *held* sufficient to sustain a submission of the case to the jury on the charge of involuntary manslaughter.

ERROR to the district court for Adams county: HARRY S. DUNGAN, JUDGE. *Reversed.*

*J. E. Willits,* for plaintiff in error.

*Clarence A. Davis, Attorney General,* and *C. L. Dort, contra.*

FLANSBURG, J.

Criminal prosecution for manslaughter, charged to have been committed by defendant through the unlawful act of giving deceased intoxicating liquor, which the deceased drank and which caused his death. Defendant was found guilty and brings the case here for review.

It is his contention that the evidence introduced by the prosecution is insufficient upon which to base the charge.

The evidence in behalf of the state shows that the defendant, Thiede, and others, some weeks previously, had attempted to make intoxicating liquor on the Nelson farm; that they had a coil and a kettle and had distilled some liquor. Just what the nature of the liquor was and what quantity they made is not shown. On the day in question, defendant, with one Stromer and Forney, who were also originally charged with the commission of the offense in this case, went to the Nelson farm. Defendant dug up three jugs of white whiskey which had been buried on the place, and he and Forney then went to the town

of Prosser. In the course of an hour they returned with two girls. Stromer was found lying on the ground in a drunken stupor, with the jugs near him. At this time the farmer, Nelson, was present and defendant gave him a drink from the jug. He testified that it tasted like hot acids and temporarily paralyzed him, and that, at the time of trial, he still felt the effects. The defendant, Stromer and Forney drank of the liquor, and the girls each drank once from a coffee cup, containing a mixture of the liquor and grape juice. One of the girls testified that she had used whiskey before, but that this was the first time she had taken too much.

That evening, at about 7:30, a party was made up with four young men from the town of Prosser, and these seven boys and the two girls went into the country. The four boys from Prosser by name were Lambrecht, Montey, Hendriks, and Kroll, the deceased. When the cars reached their destination, defendant produced one of the jugs and passed it around, with the statement that they might take what they wanted. All of the men then took one drink from the jug. The jug was then placed on the running board of one of the cars, and the party separated, but remained in the near vicinity for from half to three-quarters of an hour, at the end of which time they again all assembled at the cars. The party then seemed gay and hilarious. Defendant again passed the jug and all but one, Montey, took one more drink. The state's testimony shows that neither deceased nor any of the other Prosser boys took more than the two drinks. They then drove to Prosser, a mile and a quarter distant. When they arrived Lambrecht, Hendriks and the deceased were very drunk. Lambrecht went into a picture show, and he testifies that the next he remembered was when he awoke at home the next morning. Hendriks, stupefied, remained in the seat of his car all night and went home at 6 o'clock the next morning. The deceased was unable to talk when he reached Prosser, and was utterly helpless. He began vomiting and was taken home by

Thiede v. State.

his brother and placed upon the floor, where he remained unconscious. A doctor arrived at midnight and administered strychnine and atropin, and at 3 a. m. Kroll was dead. The doctor testified that death was the result of alcoholic poisoning.

Defendant the next morning, before he had heard of the death of Kroll, made a test of the liquor by touching a match to some that had been poured on the ground, and it was found to burn. A chemist testified that he made a gravity test and also an analysis by distilling the liquor, and found that it contained 57 per cent. "pure alcohol," but that he made no analysis for the discovery of other ingredients.

The testimony in defendant's behalf conflicts in many material aspects with that just related, but, to determine the question presented, it is unnecessary to consider his version of the case.

Under our statutes, it is manslaughter to "unlawfully kill another without malice, * * * or unintentionally, while the slayer is in the commission of some unlawful act." Rev. St. 1913, sec. 8583.

It is not questioned that the giving of liquor to the deceased, under the circumstances shown in this case, was in violation of the prohibitory law of this state, and that for the act the defendant was subject to fine and imprisonment. It is the defendant's contention, however, that the act of giving liquor is an act merely *malum prohibitum,* and is not in its nature such an unlawful act as carries with it that intentional wrong toward another which will supply the place of the criminal intent otherwise necessary to any criminal homicide.

In the commission of those unlawful acts which are criminal in their nature and which the law characterizes as *malum in se,* there is always found an intent on the part of the perpetrator of the offense to commit a wrong as against the person or property of another, and, though the wrong or injury committed may not be calculated nor intended to do great injury, nor to produce death, the per-

son committing the act is not allowed to stop with the effect he intended to produce, but is held, in law, responsible for the full consequences of his act, and, where the result in such a case is death, a wrongful intent being present, the act is held to be involuntary manslaughter.

It is obvious, however, that there are acts prohibited by law which are not in their nature criminal, and in the commission of which the perpetrator of the act has no intent to do harm nor to injure another in his person or property. Where such a wrongful intent is not present and the act is wrong only because prohibited, it is an act *malum prohibitum,* and, where in the perpetration of such an act death results, the law will not convert the act, innocently done and done with no intent to injure and with no disregard for the safety of another, into a criminal act and pronounce the act manslaughter. It is therefore necessary to look particularly to the nature of the act committed in this case, in order to determine whether it is such an "unlawful act" as comes within the purview of the statute.

In the cases of *Ford v. State,* 71 Neb. 246; *Lindsay v. State,* 46 Neb. 177, and *Schultz v. State,* 89 Neb. 34, the unlawful acts were held to be sufficient. In the *Ford* case the defendant playfully pointed a pistol at another person, having some reason to believe that it was not loaded. The pistol was accidentally discharged and the person unintentionally killed. The court held, in accord with the general holding in other states on that question (note, 5 A. L. R. 611), that the intentional pointing of a pistol was a criminal assault, and, however unintentional might have been the act of shooting, the act of intentionally pointing the pistol was an act calculated to endanger the safety of the person pointed at, and was an act which might reasonably, by accident, result in death.

In the *Lindsay* case, *supra,* the defendant and another engaged in a prize fight, contrary to the statute. This was not only an unlawful act, but a mutual combat, tending to cause severe personal injuries to the combatants,

Thiede v. State.

and the killing of one during the fight was, therefore, held to be manslaughter.

In the *Schultz* case, *supra,* defendant was convicted of manslaughter by reason of his having killed a person while driving his automobile at an unlawful rate of speed upon the streets of Omaha. The speed statute prohibited the driving of any vehicle at a greater rate of speed than was reasonable and proper, with regard to the traffic, or "so as to endanger the life or limb of any person." Comp. St. 1909, ch. 78, sec. 147. It is apparent that to drive a car so as to endanger the life or limb of any person evidences such disregard for the safety of persons on the street as to supply the intent to do wrong and to inflict injury. In that case it was argued that the violation of the speed statute was an act merely *malum prohibitum,* and was not criminal in its nature, and, therefore, not an unlawful act within the manslaughter law. To this the court said that, since it appeared the act was done with a careless disregard for the safety of others, it was sufficient, and that "there seems to be no conflict in the decisions where the defendant is violating some statute, and where his manner is negligent and careless. The courts in such cases uniformly say that he is guilty of manslaughter if the death of some other person is the result."

We believe the rule to be that, though the act, made unlawful by statute, is an act merely *malum prohibitum* and is ordinarily insufficient, still, when such an act is accompanied by negligence or further wrong, so as to be, in its nature, dangerous, or so as to manifest a reckless disregard for the safety of others, then it may be sufficient to supply the wrongful intent essential to criminal homicide, and, when such act results in the death of another, may constitute involuntary manslaughter.

Such an unlawful act alone, unaccompanied by negligence, is insufficient. *Potter v. State,* 162 Ind. 213, 64 L. R. A. 942; *State v. Horton,* 139 N. Car. 588, 1 L. R. A. n. s. 991; *Estell v. State,* 51 N. J. Law, 182; *Common-*

*wealth v. Adams,* 114 Mass. 323; *People v. Pearne,* 118 Cal. 154; *State v. Trollinger,* 162 N. Car. 618.

In the case of *Potter v. State,* the court held that the death of one of the participants in a friendly scuffle through the accidental discharge of a pistol, carried in the pocket of the other, contrary to the provisions of a statute, cannot be said to be caused in the performance of an unlawful act so as to render the one carrying the pistol guilty of manslaughter, under provisions of · a statute similar to the statute of our state. The court in that case said (p. 217) : "As a general rule, the law has such a high regard for human life that it considers as unlawful all acts which are dangerous to the person against whom they are directed, no matter how innocently they may be performed. A person will not be permitted to do an act which jeopardizes the life and safety of another, and then, upon plea of accident, escape liability for a homicide involuntarily resulting from his reckless or careless act or conduct. * * * The case at bar does not fall within that class of cases where the homicide is the result of culpable carelessness or negligence of the accused party in using or handling a dangerous weapon."

In the case of *State v. Horton,* the court held that the mere violation of the statute, making it unlawful to hunt on another's property without a permit, is not such an unlawful act as to render an accidental homicide, committed while so doing, a criminal offense.

In the case of *Estell v. State,* the defendant attempted to drive a wagon through a toll gate, in violation of law, and the toll gate keeper ran in front of the horses to stop them and was run over and killed. There the court said (p. 185) : "In this case the jury should have been told that the defendant was guilty as charged, if he did the unlawful act in question under conditions that were dangerous to the toll gate keeper; as, if he drove through the gate at a rapid pace, or urged his team of mules on after they had been seized by the deceased, * * * the criminality consisting of the two elements, of the unlaw-

fulness of the act, and the unlawfulness and danger in the mode of its execution."

In the cases of *People v. Barnes*, 182 Mich. 179; *Commonwealth v. Adams*, and *People v. Pearne, supra*, it was held that driving in excess of the specific number of miles an hour fixed by law, when not accompanied by carelessness, was insufficient; the court in the *Pearne* case saying that it was not a sufficiently unlawful act "unless at the time of the accident he (the defendant) was driving in a 'dangerous manner.'"

On the other hand, where the act which is unlawful is *malum prohibitum* merely, but is accompanied by negligence and, in its performance, the safety of others is recklessly disregarded, it is held sufficient. *Sparks v. Commonwealth*, 3 Bush (Ky.) 111, 96 Am. Dec. 196; *Brittain v. State*, 36 Tex. Cr. Rep. 406; *Silver v. State*, 13 Ga. App. 722; *State v. De Fonti*, 34 R. I. 51; *State v. Keever*, 177 N. Car. 114.

In the case of *Sparks v. Commonwealth, supra*, a young man, walking along the streets of the town, drew a revolver and said, "Let us have a Christmas gun," inquired how much the fine was, and, wheeling half about and pointing the gun backwards over his shoulder, fired and killed a bystander. The law prohibited the discharge of fire arms within the town. It was held manslaughter in the commission of an unlawful act, and, though the court declared the unlawful act was an offense *malum prohibitum*, went on to point out that (p. 115): "Sparks drew his pistol with the avowed intent illegally to shoot it then and there in the town, along its streets, where he not only had the right to infer that people lived in close proximity and might be passing, but when he actually knew several then of his company were passing. His throwing it over his shoulder, with a half-face about, with the muzzle toward those in his rear, manifests such recklessness and want of caution as to indicate not only an entire absence of every precaution to prevent the pistol from firing, but impresses the mind that he did recklessly

and intentionally so fire it; and whether he intended thereby to wound or kill any one, it was so highly disregardful of law, order, and the personal rights and safety of others, who may then have been in the streets, as to make him criminally responsible for its results."

In the case of *Brittain v. State, supra,* under a statute prohibiting the carrying of a pistol upon the person, a boy, in a party of young people, drew a revolver, and, when flourishing it about, it was discharged and another boy killed. The court said (p. 413): "We fail to see how the act of displaying the pistol on the occasion alluded to can be severed from the act of carrying a pistol on and about the person of the appellant; and, if he was so displaying it, and such display was negligent, and in a manner calculated to endanger the lives of persons standing around, and it was discharged, and deceased was killed, it would constitute the act of negligent homicide of the second degree." Under the Texas statute, a second-degree homicide is homicide in the commission of an unlawful act.

In the case of *Silver v. State, supra,* a person, not a physician and therefore in violation of a statute, administered, by means of a hypodermic, morphine to another in such quantity as to cause death, and was held guilty of manslaughter in the commission of an unlawful act. The court held that, though the act was merely *malum prohibitum,* it was sufficient to support the charge. The question of negligence was not, in that case, discussed, though the administration of such a potent drug by one unskilled in the use of it would seem to us to have justified the finding that such action was reckless conduct.

In the case of *State v. De Fonti, supra,* the defendant was charged with the unlawful sale of intoxicating liquor, in which wood alcohol had been negligently mixed and mingled, and which the purchaser had drunk and, as a result, died. The court held that the mere sale of liquor, in violation of the prohibitory law, was only *malum prohibitum,* and not such an unlawful act as to be sufficient

in itself to support the charge of manslaughter, but upon the matter of negligence, under a statute apparently not similar to our own, the court held that the defendant was sufficiently charged in the indictment with "negligent manslaughter;" saying (p. 57) : "Either the accused knew that he was delivering wood alcohol, a deadly poison, in place of whiskey, or he negligently represented the liquid so delivered to be whiskey without having any knowledge whether it was or was not the whiskey which had been called for. So acting in either event he must be held liable for the consequences of his act if it be proved at the trial."

A case somewhat similar to that is *State v. Keever, supra,* where intoxicating liquor had been unlawfully sold which contained 38 per cent. of wood alcohol, and the drinking of which caused the death of the recipient. The court held that it was manslaughter in the commission of an unlawful act, saying (p. 117) : "If the defendant put wood alcohol in the liquid to produce intoxication, without knowledge of its poisonous quality, and proceeded to sell such decoction, he was engaged in an unlawful as well as a reckless business, and if death ensued because of such poison he is guilty of manslaughter. * * * When the defendant sold this liquid to the deceased he was engaged in an unlawful act, and if the deceased died in consequence of the poison put in it by defendant, although innocent of any purpose to kill, he is guilty of manslaughter." It is apparent that the decision in that case turned largely on the question of defendant's negligence, though the court declared that the unlawful act alone would have been sufficient.

Turning, then, to the case under consideration, it is our opinion that the giving or furnishing of intoxicating liquors, unaccompanied by any negligent conduct, though unlawful, is but an act merely *malum prohibitum.* The person who treats his friend, even though the act be unlawful, has no intent to harm, nor is such an act calculated or intended to endanger the recipient of the liquor. We

cannot go so far as to say that such an act, prompted perhaps by the spirit of good-fellowship, though prohibited by law, could ever, by any resulting consequence, be converted into the crime of manslaughter; but, where the liquor by reason of its extreme potency or poisonous ingredients, is dangerous to use as an intoxicating beverage, where the drinking of it is capable of producing direct physical injury, other than as an ordinary intoxicant, and of perhaps endangering life itself, the case is different, and the question of negligence enters; for, if the party furnishing the liquor knows, or was apprised of such facts that he should have known, of the danger, there then appears from his act a recklessness which is indifferent to results. Such recklessness in the furnishing of intoxicating liquors, in violation of law, may constitute such an unlawful act as, if it results in causing death, will constitute manslaughter.

The evidence here was sufficient, as we view it, to warrant a submission of the charge of manslaughter to the jury.

The defendant, it seems, distilled this liquor himself. It was at least home-made whiskey. The danger of drinking such liquor, by reason of its extreme potency and its frequently containing poisonous ingredients, is commonly known. The defendant may have been dealing with an unknown quantity, but, as was said in the *Keever* case, he was handling a dangerous weapon. There is evidence to show that he knew this particular liquor was extremely powerful. He saw its effect on Chris Nelson and on Stromer in the morning; yet that evening he offered it to the Prosser boys and invited them to drink all they wanted. There is substantial proof that the liquor was dangerous. That two drinks of it should paralyze three men within a few minutes after drinking, and that one of these men, as a result, should die in a few hours, as happened in this case, sufficiently raises the issue of its dangerous character for the jury.

Defendant contends that the drinking of liquor by de-

ceased was his voluntary act and served as an intervening cause, breaking the causal connection between the giving of the liquor by defendant and the resulting death. The drinking of the liquor, in consequence of defendant's act, was, however, what the defendant contemplated. Deceased, it is true, may have been negligent in drinking, but, where the defendant was negligent, then the contributory negligence of the deceased will be no defense in a criminal action. *Schultz v. State,* 89 Neb. 34; *State v. Weisengoff,* 85 W. Va. 271; 21 Cyc. 766. The act of the deceased, as we view it, was no more than a concurring cause.

Defendant complains of the court's instructions, which directed the jury that, if defendant furnished intoxicating liquor to deceased, and the liquor caused death, defendant was guilty, but failed to instruct upon the question of recklessness on the part of the defendant. We believe the instructions are erroneous in that regard, and that the defendant is entitled to a new trial.

REVERSED AND REMANDED.